**EXHIBIT A**

Deposiition of Alfred Kemp
July 12, 2005

---

Page 1

VOLUME 1
PAGES: 1 - 93
EXHIBITS: 1 - 11
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. NO. 04 11975RWZ

*****************************
PACIFIC INDEMNITY COMPANY,          *
       Plaintiff,                    *
                                     *
       vs.                           *
                                     *
ALFRED KEMP, Individually and        *
d/b/a KEMP PLUMBING,                 *
       and                           *
MARTIN SANDBORG, Individually and   *
d/b/a SANDBORG PLUMBING AND HEATING, *
       Defendants.                   *
*****************************

       DEPOSITION OF ALFRED KEMP, a witness called
on behalf of the Plaintiff, taken pursuant to Rule
30 of the Massachusetts Rules of Civil Procedure,
before Jacqueline Curran, Registered Merit
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the law offices
of Ryan, Coughlin & Betke, LLP, 175 Federal
Street, Boston, Massachusetts, on Tuesday, July
12, 2005, commencing at 11:00 a.m.

              CURRAN COURT REPORTING
                21 Rowe Hill Road
            Stoneham, Massachusetts 02180
                 (781) 279-8400

---

Page 2

              A P P E A R A N C E S
REPRESENTING THE DEFENDANT, ALFRED KEMP,
Individually and d/b/a KEMP PLUMBING:
    RYAN, COUGHLIN & BETKE, LLP
    By:  John J. Ryan, Jr., Esq.
    175 Federal Street
    Boston, MA 02110
    (617) 988-8050

REPRESENTING THE DEFENDANT, MARTIN SANDBORG,
Individually and d/b/a SANDBORG PLUMBING:
    FINNEGAN, UNDERWOOD, RYAN & TIERNEY
    By:  Stimpson B. Hubbard, Esq.
    22 Batterymarch Street, 4th Floor
    Boston, MA 02109
    (617) 348-9200

REPRESENTING THE PLAINTIFF:
    COZEN O'CONNOR
    By:  Daniel Q. Harrington, Esq.
    1900 Market Street, 3rd Floor
    Philadelphia, PA 19103-3508
    (215) 665-2126

ALSO PRESENT:
    Wayne A. Garcia, Esq.
    The Commerce Insurance Company
    11 Gore Road
    Webster, MA 01570-0758

---

Page 3

              I N D E X
WITNESS:  Alfred R. Kemp
Examination By:  DIRECT CROSS REDIRECT RECROSS
    Mr. Harrington  5

              E X H I B I T S
No.    Description              Page

No. 1, Invoice dated 12-13-19-02      22

No. 2, calendar for December 2002     23

No. 3, log               30

No. 4, one-page calendar 12/18 and 12/19   33

No. 5, one-page Materials and Labor Sheet   35

No. 6, Fire Investigation Summary Report   37

No. 7, color photocopy of photograph   44

No. 8, color photocopy of photograph   52

No. 9, color photocopy of photograph   82

No. 10, large color photograph      83

No. 11, large color photograph      84

(All original exhibits retained by Attorney
Harrington)

---

Page 4

1        ALFRED R. KEMP, having been satisfactorily
2    identified by the production of his driver's
3    license, and duly sworn by the Notary Public, was
4    examined and testified as follows:
5        MR. RYAN:  The torch, do you
6    have the torch that you would have been
7    using on that job?
8        THE WITNESS:  Yes.
9        MR. RYAN:  The same one?
10       THE WITNESS:  Yes.
11       MR. RYAN:  Would you make sure
12   when you take a photograph, you take a
13   photograph of the model number and --
14       THE WITNESS:  I'll write down
15   the model numbers of it.
16       MR. RYAN:  I assume you're going
17   to want that.
18       MR. HARRINGTON:  Sure.
19       THE WITNESS:  I can tell you
20   right now it's a T2 tip LP --
21       MR. RYAN:  He'll ask you.
22       MR. HARRINGTON:  I'll try to get
23   the detail of it when we get to that point,
24   that's fine.  Thank you, Mr. Kemp.

---

PLAINTIFF'S
EXHIBIT
A

...ges 1 to 4)

Deposiition of Alfred Kemp
July 12, 2005

Page 73

1    THE WITNESS:  Sorry, her.
2    MR. HARRINGTON:  Are we going
3  too fast again?
4    MR. RYAN:  Both of you are very
5  brisk.
6    Q.  Well, when the time came for you to put
7  in the sink, where did you go to get it?
8    A.  It was on the site.
9    Q.  I know, but was it sitting there in the
10  kitchen?  The kitchen didn't look that big to me,
11  was it in the kitchen, was it back in the
12  basement, somewhere else?
13    A.  It was probably in the staging area
14  behind the kitchen in the -- where the fireplace
15  was.
16    Q.  And do you know how long it had been on
17  the site?
18    A.  I do not.
19    Q.  Was the first time you saw it when you
20  went and got it to put it in?
21    A.  Yes.
22    Q.  Now, looking back at the fire marshal
23  report, paragraph nine again, if you go down two
24  thirds of the way down, there's a sentence that

Page 74

1  starts right at the left margin, "Al said that he
2  went to hook up the garbage disposal, but realized
3  that it would not fit."  What's that referring to?
4    A.  The garbage disposal was hitting one of
5  the valves coming up right here because that's
6  what we call a D type sink where the drain is in
7  the back of the sink, not in the center of the
8  sink.  I didn't pay attention to the sink when I
9  installed these on the 18th, so when I went to
10  install the garbage disposal, it was hitting this
11  valve here so it could not be installed.
12    Q.  Okay.  You've said "this valve here," so
13  what I'm going to do, let's find a red pen and ask
14  you to circle on Kemp seven the valve which
15  interfered with the garbage disposal.
16    A.  (Witness complies.)
17    Q.  That would have been the hot water valve
18  for the faucet?
19    A.  It was probably both of them, both these
20  risers.
21    Q.  So circle the other one when you say
22  both.
23    A.  (Witness complies.)
24    Q.  So you've circled two valves on Kemp

Page 75

1  seven, is that right?
2    A.  Correct.
3    Q.  Now, was it that the disposal -- when
4  you say the valves, was it interfering with the
5  handles that protrude -- now let me finish this
6  question, it's going to be more complicated maybe
7  than some of the others -- was it interfering with
8  the handles that protrude forward off the valves
9  or were the risers, the pipes themselves, in the
10  way of the garbage disposal?
11    A.  The handles were hitting the garbage
12  disposal.
13    Q.  And when you had put this piping in, it
14  was on the assumption that it was the more
15  standard centered sink?
16    A.  Unfortunately, I didn't look at the sink
17  so yes, my assumption was that it was a standard
18  sink.
19    Q.  When did you realize this?
20    A.  3:00, 3:30.
21    Q.  What was your game plan?
22    A.  Time to go home.
23    Q.  Did you have a thought at the time in
24  terms of what you were going to do to get the

Page 76

1  garbage disposal in?
2    A.  Shut down the water, drain the building
3  down, turn the handles so that they wouldn't
4  interfere with the garbage disposal.
5    Q.  When you say, "turn the handles," you
6  mean rotate the valves?
7    A.  That's correct.
8    Q.  That's all you would have needed to do?
9    A.  I had hoped.
10    Q.  Did you know whether you'd be able to do
11  that with the risers still in place as they appear
12  on Exhibit 7?
13    A.  I believe so at the time.
14    Q.  The interview a couple sentences after
15  that says, "Al said that he had put all the
16  stops in on Wednesday around noon but was going to
17  have to move two of the stops on Friday."
18    Now, is that what that's referring to,
19  rotating the two valves?
20    A.  Yes.
21    Q.  You wouldn't have rotated the portion of
22  the risers which extend above the valves, right?
23    A.  No, sir.
24    Q.  So to accomplish that, what you would

19 (Pages 73 to 76)

Deposition of Alfred Kemp
July 12, 2005

Page 77

1   have had to have done is loosen the solder joints
2   at both ends of each valve enough to allow the
3   valve to be rotated?
4       A.   Correct.  I would have unsoldered it,
5   taken it apart, put it back together.
6       Q.   You would have physically taken it off
7   then?
8       A.   Correct.
9       Q.   It's not just a matter of heating and
10  rotating it?
11      A.   No.
12      Q.   'Cause that would mess up your solder?
13      A.   That would mess up a lot of stuff.
14      Q.   What else would it mess up?
15      A.   What else would it mess up?  It would
16  mess up all my solder stuff there, exactly.
17      Q.   How do you do that, how would you do
18  that, how would you get the valve off where it's
19  mounted?
20      A.   Shut the building down --
21      Q.   I'm with you to the point where you get
22  the water off.
23      A.   -- drain it down, protect the bottom of
24  the cabinet again, heat the -- just the opposite

Page 78

1   of putting on, heat it till the solder gets hot,
2   take a pair of pliers, put them on the -- onto the
3   valve, twist it off.
4       Q.   Do you apply the heat to the body of the
5   valve and heat up the valve or do you actually try
6   to direct the heat at where the solder joint is at
7   the base?
8       A.   You direct it at the solder joint.
9       Q.   And then you would get that valve up and
10  out of there and the piece that's on it and then
11  take the rest of the piping off the top of the
12  valve?
13      A.   That's correct.
14      Q.   Out where you have more ability to see
15  what you're doing?
16      A.   Absolutely.
17      Q.   How far down did the bottom of the sink
18  extend?
19      A.   I'm not sure.  That sink I believe was
20  seven to seven and a half inches deep.
21      Q.   Which without a cart counter there
22  doesn't tell us, but was it below where the tops
23  of the risers are in the photo Exhibit 7?
24      A.   My guess, I don't think so.  I can see

Page 79

1   the countertop here.  It was probably a few inches
2   between those and the bottom of the sink.  That's
3   a guess.
4       Q.   Had you scoped things out to the point
5   that you were satisfied that all you would have to
6   do is rotate the two valves in order to make it
7   all fit?
8       A.   Again, it was the end of the day, I know
9   I had to disassemble it and at that point wrap up
10  and I was going to deal with it the next day.
11      Q.   Did you intend to charge Mr. Sandborg
12  for the time it was going to take you to redo the
13  plumbing?
14      A.   Yeah.
15      Q.   Why?
16      A.   Everybody makes mistakes.
17      Q.   That's the practice in your business?
18      A.   I make a mistake occasionally, someone
19  else makes a mistake, yes, you know, it wasn't
20  going to be a two-hour job.
21      Q.   When did you first hear about the fire?
22      A.   6:30 Friday morning.
23      Q.   How did you hear about it?
24      A.   Marty.

Page 80

1       Q.   What did he say to you?
2       A.   Don't go to Marinos.
3       Q.   Before that discussion at 6:30 Friday
4   morning, did you discuss with Mr. Sandberg that
5   you had had a problem or Sandborg that you had had
6   a problem with the conflict between the garbage
7   disposal and the plumbing?
8       A.   I don't recall.  I was going back
9   anyways.
10      Q.   Did he know that?
11      A.   Whether it was an issue with the garbage
12  disposal?
13      Q.   No.  Did he know you were going back on
14  Friday anyway?
15      A.   Yes.
16      Q.   And how did he know that?
17      A.   I had told him that I wasn't through
18  there and I needed to go back and finish up.
19      Q.   You told him that while he was there on
20  Thursday afternoon?
21      A.   I believe he understood that on Thursday
22  afternoon, yes.
23      Q.   Did you ever mention this problem that
24  you had encountered to Mr. Sandborg?

20 (Pages 77 to 80)

**EXHIBIT B**

THOMAS W. EAGAR, Sc.D., P.E.
ROOM 4-136
MASSACHUSETTS INSTITUTE OF TECHNOLOGY
CAMBRIDGE, MA 02139-4307
617-253-3229
FAX 617-252-1773

February 24, 2006

Cozen O'Connor
The Atrium
1900 Market Street
Philadelphia, Pennsylvania 19103

Attention:    Dan Harrington

RE:          Marino v. Alfred Kemp

Dear Mr. Harrington,

At your request, I have investigated the plumbing installation under the sink in the above referenced fire loss. It was requested that I determine whether the valve and nipples and elbow were soldered to the vertical riser pipe at the time of the fire, or whether the solder joint had been unsoldered prior to the fire. My investigation has included the following:

1.  Review of photographs of the fire scene.

2.  Review of the 12 July 2005 deposition of Alfred Kemp with exhibits.

3.  Review of expert reports of:

        T.J. Klem              29 July 2005
        J. Lester McLaughlin   26 July 2005
        D. Galler              26 July 2005

4.  Review of the inspection test results from Massachusetts Materials Research on January 16, 17 and 18, 2006.

5.  Testing of exemplar soldered connections in my laboratory.

Based upon this investigation, I have made the following observations and I have formed the following opinions based upon a reasonable degree of engineering certainty.

1.  The earliest photographs of the fire scene show the valve assembly in the debris on the floor, unattached to the vertical riser. There are two unsoldered joints on the top and bottom of this valve assembly.

PLAINTIFF'S
EXHIBIT
13

Dan Harrington
February 24, 2006
Page Two

2. The nipples and elbow of the valve assembly are oxidized to a dark color due to heat. The solder in the two separated joints of the valve assembly has been remelted, allowing the two joints to separate; however, a ring of unmelted solder is present on the top nipple of the vertical tee which was separated from the lower valve assembly joint. This ring of solder did not melt during the fire. In addition, there is a ring of black immediately above the solder ring on the top nipple of the vertical tee. This indicates that the soldered joint was separated when exposed to the fire.

3. The ring of solder on the top nipple of the vertical tee could not have remained if an advancing fire had been hot enough to unsolder the valve from the nipple. The heat intensity of an advancing fire is less than ten watts per square centimeter.[Reference 1] The thermal conductivity of copper is approximately 4 watts per centimeter per degree Centigrade. Thus, based upon Fourier's First Law of Heat Conduction, the maximum temperature gradient that can be supported by the copper in an advancing fire is only 2.5 degrees per centimeter. This temperature gradient is much too small to permit melting of the solder joint in an advancing fire without melting and reflow of the solder on the ring on the top nipple of the vertical tee. The only way the joint could be unsoldered without reflowing the ring of solder, would be application of the high heat intensity of an air-fuel gas torch (approximately 100 watts per square centimeter[Reference 2]) to the valve body. Such a torch can develop rapid heating and temperature gradients in the copper of 25 degrees Centigrade per centimeter. This is sufficient to unsolder the joint while maintaining an unmelted ring of solder.

4. There could have been no water in the pipe when the solder melted, since the water would turn to steam well before the solder melted. Again, this is based upon the inability of copper to support a steep temperature gradient at the heat intensities of advancing fires.

5. As noted above, there were two unsoldered joints on the system after the fire. If both joints were soldered prior to the fire and the system was pressurized with water, the advancing fire would have to boil the water to steam in order to heat the solder to its melting point. (The melting point of the solder exceeds 200°C based on the chemical analysis of the solder.) If the steam pressure became great enough and the temperature became high enough to melt the solder in an advancing fire, only one joint could become unsoldered in the fire. Once the first joint became unsoldered, the steam pressure would be relieved and there would be no pressure remaining to separate the second joint.

Dan Harrington
February 24, 2006
Page Three

6. Tests in my laboratory indicate that a valve and copper nipple system pressurized with water, does not fail in an advancing fire by melting the solder and separation of a solder joint. The joint fails by development of a leak in the solder joint, causing water to flow and spray. The flowing water cools the joint, thus strengthening it. At the same time as the flowing water cools and strengthens the joint, the pressure is reduced. Only local melting of the solder occurs. No overall melting of the solder occurs, the joint does not separate and a solder ring is not left behind as is observed on the incident failure.

7. I have made valve to nipple solder joints with tin-3 percent copper solder in my laboratory. After cooling, I used a plumber's torch to heat the valve body, while applying upward force on the valve using a pair of pliers. The high heat intensity of the fuel-air torch permitted the joint to be unsoldered while leaving a ring of solder which is similar to the ring present on the incident top nipple of the vertical tee.

8. Inspection of the scene photographs indicates that wooden objects adjacent to the vertical tee assembly remain unburned. If an advancing fire had achieved the 200°C necessary to melt the solder in the area of an intact valve assembly, the surrounding wood would have been charred since such temperatures are within the pyrolysis temperature range of wood.[Reference 3]

The physical evidence and the earliest fire scene photographs are not consistent with Mr. Kemp's testimony that the water pressure was on and the valve had not yet been removed from the riser. Based on a heat conduction analysis, it would be impossible for an advancing fire to unsolder the joint without reflowing the ring of solder. Tests of an exemplar solder joint exposed to a flaming fire cause a solder joint leak without any evidence of full joint melting or separation of the valve from the nipple. On the otherhand, I have reproduced the remaining solder fillet ring, by using a plumber's torch to unsolder an existing joint.

Based upon this investigation, I conclude that the physical evidence of two separated and reflowed solder joints, plus the ring of un-remelted solder can only be consistent with Mr. Kemp having unsoldered the joint prior to the fire.

Sincerely yours,

Thomas W. Eagar

Thomas W. Eagar

jh

**EXHIBIT C**

# Metallurgical Examination of Soldered Pipe Joints

Prepared for:

Virginia W. Connelly
Ryan, Coughlin & Betke
175 Federal Street
Boston, MA 02110

Prepared by:

Quinn C. Horn, Ph.D.
Exponent, Inc.
21 Strathmore Road
Natick, MA 01760

March 7, 2006

© Exponent, Inc.

BN63809-A0T0-0306-R005



PLAINTIFF'S
EXHIBIT

March 7, 2006

# Executive Summary

Exponent analyzed two pipe joints recovered from the Marino carriage house fire that occurred on December 20, 2002. Both pipe joints were soldered at some point prior to the fire, but were found separated under the kitchen sink after the fire. The purpose of the analysis conducted by Exponent was to determine when these two soldered joints were separated.

Exponent analyzed the subject joints by optical microscopy and scanning electron microscopy (SEM) coupled with energy dispersive spectroscopy (EDS). The following results have been obtained from the analyses performed on these joints:

1.   Both joints were comprised of a copper tube soldered to a brass fitting.

2.   The solder was a lead-free, tin-based alloy with a small amount of copper.

3.   The brass fittings were composed of a "free-machining" or leaded-brass.

4.   A thick deposit of solder was present on the copper tubes, whereas significantly less solder residue was found on the corresponding brass fittings.

5.   Lead was detected in the solder deposit on the outer surface of the copper tubes and the inner surface of the brass fittings.

6.   A ridge of solder on one of the copper tubes showed no evidence of melting.

Based upon the results from these analyses, and general observations of the joints, Exponent has formed the following opinions with regards to the separation of these joints:

1.   At the time the fire began, all joints of the water piping were intact.

2.   The heat from the fire was sufficient to melt the solder at the copper/brass interface, but not the copper/copper soldered joints.

March 7, 2006

3. Pressure within water line provided the force necessary to separate joint between the copper tube and the brass valve when the solder melted.

4. The separation of the joint between the copper tube and the brass compression fitting followed. Either the weight of the brass valve/copper tube assembly or the movement of components during the fire could have provided sufficient force to separate this joint once the solder melted.

Details of the testing and results that these opinions are based on are contained in the following sections of this report. If additional information becomes available or additional analysis is performed, I reserve the right to revise these opinions.

# Introduction

On December 20, 2002, a fire damaged the carriage house owned by Mr. Marino in Dedham, Massachusetts. The kitchen was among the rooms in the carriage house that incurred damage from the fire. The support structure surrounding the kitchen sink was weakened by the fire damage and resulted in the collapse of the sink. Upon investigation of the kitchen area, the sink was removed and water piping under the sink was inspected. One segment of piping from the cold water supply line was found separated from the other piping. This segment consisted of a brass valve soldered to a section of copper tubing, and is shown in Figure 1. The original location and orientation of this segment under the sink is shown in Figure 2.

The separated female portion of the brass valve shown in Figure 1 was originally soldered to the vertical section of copper tubing shown in Figure 3, and the copper tube was soldered to the brass compression fitting shown in Figure 4. The brass compression fitting was threaded onto a plastic-lined, flexible, braided stainless steel hose. This braided hose can also be seen in Figure 4.

It is readily apparent that, in order for the segment of piping shown in Figure 1 to become completely decoupled from the cold water supply line, two soldered joints had to be separated. It is also apparent that two conditions must be met to separate a soldered joint. First, the joint must be heated to a temperature sufficient to melt the solder. Second, a force must be applied to the joint to parallel to the pipe axis such that the opposing joint sections are pulled away from each other while the solder is molten. In this investigation, Exponent analyzed the joint sections shown in Figure 1, Figure 3 and Figure 4 to determine the point in time when these two conditions were met, leading to the separation of these joints.

March 7, 2006



Figure 1.     Photograph of the detached valve and connected copper tube.  A photograph of the corresponding male fitting is shown in Figure 3 and the corresponding female fitting is shown in Figure 4.



Figure 2.     Photograph showing the area under the kitchen sink where the detached valve and connected copper tube would have been located prior to the fire.  The red arrow denotes the separated brass valve/copper tube assembly shown in Figure 1.

BN63809-A0T0-0306-R005

2

March 7, 2006



Figure 3.    End of copper tubing that was soldered to the brass valve
shown in Figure 1.

March 7, 2006



Figure 4.      Photograph of the brass fitting that was soldered onto the
               exposed copper tubing in Figure 1.

March 7, 2006

## Analysis and Results

The four separated pipe joint sections that were examined in this investigation are shown in Figure 5 through Figure 8. Each separated joint was inspected by stereomicroscopy techniques, followed by scanning electron microscopy (SEM) and finally metallography and optical microscopy. The protocol that was followed for preparing and inspecting each of these joints was:

1. Stereomicroscopy of as-received joint;

2. First cut using a water-cooled band saw, as shown in Figure 5 through Figure 8;

3. Perform SEM analysis on the OD (Outer Diameter) of the removed joint;

4. Second cut using a water-cooled band saw, as shown in Figure 5 through Figure 8;

5. SEM analysis on the ID (Inner Diameter) of the removed joint;

6. Metallographic preparation of one half of each joint: mount in epoxy molding compound and polish through 0.25 μm polishing media;

7. Optical microscopy on the polished specimens;

8. SEM on selected polished specimens;

The preparation and analysis was performed at laboratories of Massachusetts Materials Research on January 16, 17 and 18 of 2006. It should also be noted that all samples analyzed by SEM on January 17 and 18 were rinsed with de-ionized water to remove any water-soluble contamination from the surface.

The results obtained from these analyses are presented in detail in the following sections of this report.

BN63809-A0T0-0306-R005

March 7, 2006



Figure 5.    Male joint component that mated to the female joint shown
in Figure 6.  The red lines indicate where the joint was cut
for analysis. This joint section is referred to as "Joint
Section 1" in this report.



Figure 6.    Female joint component that mated to the male joint
shown in Figure 5.  The red lines indicate where the joint
was cut for analysis. This joint section is referred to as
"Joint Section 2" in this report.

March 7, 2006



Figure 7.     Male joint component that mated to the female joint shown in Figure 8. The red lines indicate where the joint was cut for analysis. This joint section is referred to as "Joint Section 3" in this report.



Figure 8.     Female joint component that mated to the male joint shown in Figure 7.  The red lines indicate where the joint was cut for analysis. This joint section is referred to as "Joint Section 4" in this report.

## Joint Section 1

Joint Section 1 is the portion of copper tubing that was soldered to the female brass valve fitting. A stereomicroscope image of Joint Section 1 is shown in Figure 9. The prominent feature on this section of copper tubing is the ridge that circumnavigates the tube. This ridge is shown at a higher magnification in the SEM image in Figure 10. EDS analysis was performed in the regions denoted by the red boxes labeled "1" and "2" in this image. The spectra acquired from this analysis are shown in Figure 11 and Figure 12. The likely source of the carbon peaks in these spectra is soot or other carbonaceous material deposited during or after the fire. The source of the oxygen peaks is likely metal oxides. The primary metallic elements present in these regions are tin and copper, which indicates that this ridge is composed of solder.

The conversations with the plumber who initially installed this pipe indicated that he typically used Canfield "100% Watersafe" or similar brand solder. According the manufacturer's MSDS, the composition of this solder is 95% tin, 4% copper and 1% silver, by weight. While both tin and copper are present in the spectra in Figure 11 and Figure 12, silver is not detected. Unfortunately, the most intense silver peak has an energy of 2.98 eV, which overlaps with one of the low intensity tin peaks. The approximate location of the silver peak is indicated in both spectra. As a result of this peak overlap, and the relatively small amount of silver in this alloy, EDS cannot confirm the presence of silver in this solder. The presence of the lead peak in Figure 12 is interesting because "100% Watersafe" and other plumbing solders are lead-free alloys; therefore, the lead must come from another source.

This section of copper tubing was cut parallel to the axis of the tube and metallographically prepared so that the cross-section of the copper/solder interface could be investigated. A stereomicroscope image of this cross-section is shown in Figure 13. The ridge of solder can be clearly seen on both sides of the cross-section. This ridge is shown at a higher magnification in Figure 14. It is very interesting to note that the ridge of solder appears to have retained its original shape and still comes to a rather sharp point. The shape of this solder ridge indicates that the solder was not molten when joint was separated. If this ridge of solder had melted, then surface tension would have cause the ridge to lose its original shape in order to reduce its surface area.

A layer of solder is present on the right of the solder ridges shown in Figure 14.  This layer of solder would have been present between the brass valve fitting and the copper tube prior to their separation.  The photomicrographs in Figure 15 show this layer of solder at a higher magnification.  From these photomicrographs it can be seen that the solder remaining on the surface of the copper is approximately 200 µm thick.



Figure 9.        Stereomicroscope image of Joint Section 1.

March 7, 2006



Figure 13.    Stereomicroscope image of the polished cross-section of
             Joint Section 1.

March 7, 2006



Figure 14.    Stereomicroscope images of the polished cross-section of
              Joint Section 1 showing the solder ridge at higher
              magnification.

## Joint Section 2

Joint Section 2 refers to the female brass valve fitting that was soldered to Joint Section 1. A stereomicroscope image of Joint Section 2 is shown in Figure 16. An SEM image of the inner surface of Joint Section 2 is shown in Figure 17. The red box in this image denotes the region where EDS analysis was performed on this surface. The spectrum acquired from this EDS analysis is shown in Figure 18.

Similar to the corresponding surface of Joint Section 1, the EDS analysis shows the presence of carbon and oxygen on the surface. As with Joint Section 1, it is likely that this carbon and oxygen is a result of soot and oxides that accumulated on the surface during and after the fire. The metals detected include tin, copper, aluminum and lead. All of these elements except aluminum are present in the solder and/or the brass alloy. A discussion with the SEM operator at MMR revealed that the aluminum is likely an artifact of the aluminum sample holder and not the sample itself.

The female brass valve fitting was cut parallel to the axis of the tube and prepared metallographically so that the cross-section of the brass/solder interface could be investigated. An optical photomicrograph of this interface is shown in Figure 19. It should be noted that this photomicrograph was taken at the same magnification as the photomicrograph in the bottom of Figure 15. It is apparent from this photomicrograph that the amount of solder remaining on the surface of the brass is significantly less than that found on the corresponding copper tube.

A backscattered electron image of the same cross-sectioned sample is shown in Figure 20. As with the optical photomicrograph, it can be seen that the amount of solder remaining on the brass fitting is only ~10 μm, which is approximately 20 times less than that found on the copper tube. The bright regions in the brass cross-section are metallic lead that is present as part of the brass alloy. EDS analysis was conducted at the points denoted by the numbered arrows in this figure. The spectra acquired from this analysis are shown in Figure 21, Figure 22 and Figure 23.

March 7, 2006

## Joint Section 3

Joint Section 3 refers to the copper tube that was soldered to the female brass compression fitting. Stereomicroscope photos of Joint Section 3 are shown in Figure 24 and Figure 25. The prominent features on Joint Section 3 are the large deposits of solder residue on the outer surface of the tube. Unlike Joint Section 1, the solder on the surface of this section of the copper tube appears to have been molten at some point after the joint was separated. This section of tubing was also cross-sectioned and metallographically prepared to analyze the interface between the copper tubing and the solder. An optical photomicrograph of this interface is shown in Figure 26. The thickness of the solder deposit on the copper tube is ~200 μm, which is consistent with the thickness of the solder left on Joint Section 1.

March 7, 2006



Figure 24.    Stereomicroscope images of Joint Section 3 showing the
solder remaining on the outer surface of the copper tube.

March 7, 2006



Figure 25.    Stereomicroscope images of Joint Section 3 showing the
              solder remaining on the outer surface of the copper tube.

## Joint Section 4

Joint Section 4 refers to the female brass compression fitting that was soldered to the copper tube Joint Section 3. A stereomicroscope image of Joint Section 4 is shown in Figure 27. A backscattered SEM image of the inner surface of this fitting is shown in Figure 28. EDS analysis was performed in the regions outlined by red boxes #1 and #2. The spectra acquired from this analysis are shown in Figure 29 and Figure 30. As with the other brass fitting, the presence of tin on the surface is indicative of a surface film of solder, whereas the copper and lead are from the brass fitting. Figure 31 contains optical photomicrographs showing the polished cross-section of Joint Section 4. The thickness of the solder residue on the inner surface of the brass fitting is much less than that found on the copper fitting. This finding is similar to that for other brass fitting: Joint Section 2.



Figure 27.    Stereomicroscope image of Joint Section 4.

March 7, 2006

# Discussion

The key results from the analyses presented in the previous section can be summarized as follows:

1. Both joints that separated were comprised of a copper tube soldered to a leaded-brass fitting.

2. The solder was a lead-free, tin-based alloy with a small amount of copper, which is consistent with the type of solder that Mr. Kemp claims to have used.

3. A thick deposit of solder was present on the copper tubes, whereas there was significantly less solder residue on the corresponding brass fittings.

4. Lead was detected in the solder deposit on the outer surface of the copper tubes and the inner surface of the brass fittings.

5. A ridge of solder on one of the copper tubes showed no evidence of melting.

6. One of the separated joints was part of a threaded compression fitting attached to a flexible hose. This fitting could easily have been removed by simply unscrewing the threads.

As mentioned in the introduction of this report, it is apparent that two conditions must be met to separate a soldered joint. First, the joint must be heated to a temperature sufficient to melt the solder. Second, a force must be applied to the joint to parallel to the pipe axis such that the opposing joint sections are pulled away from each other.

In the case where a plumber used a torch to supply the heat, the torch would have been directed onto the fitting until the solder reached its melting point. The joints would then have been pulled apart and the plumber would likely remove the excess solder from the copper tube using a wet towel or rag while the solder was molten. It is important to remove the excess molten solder so that the joint can be soldered again in the future. The plumber will typically remove the excess solder from the separated joint while the solder

is molten; otherwise, the joint must be heated again at some point in the future to remove the excess solder.

Consider Joint Section 1, which is the copper tube with the ridge of solder. It is apparent that this ridge was not removed by a plumber after the joint was separated, which is not consistent with a plumber that is preparing a joint for future use. It is also apparent that this ridge of solder was not molten during the separation of the joint, and a plumber would typically supply sufficient heat to melt the excess solder to make it easy to remove. With respect to Joint Section 3, which is the copper tube that was joined to the brass compression fitting, there was a considerable amount of excess solder found on the copper tube, indicating that the solder from the original joint was not removed after the joint was separated. Also, it would not have been practical to de-solder this joint since unthreading the compression fitting could have easily separated it.

Therefore, the following findings are inconsistent with common industry practice when using a torch to separate the soldered joints:

1. The ridge of solder on the copper tube that did not melt during or after the separation of the joint.

2. The considerable amount of excess solder present on the copper tubing.

3. The separation of a soldered joint that could have readily been removed by unthreading a compression fitting.

Now consider the possibility that heat from the house fire resulted in the separation of the soldered joints. This possibility leaves the following questions unanswered:

1. Why did the ridge of solder on Joint Section 1 not melt?

2. Why did only two of the soldered joints become separated?

3. Why was most of the solder residue present on the copper tubes and not the brass fittings?

4. What was the force that separated the joints once the solder melted?

BN63809-A0T0-0306-R005

The first three questions can be answered by considering the metallurgy of the copper/solder/brass joint. This joint consists of copper and brass bonded by a thin layer of solder. The solder in this case was predominantly a tin/copper alloy. Since copper has limited solid solubility in tin, the microstructure of this alloy consists of two distinct phases: $\eta$ (50:50 copper:tin) and tin, as indicated by the copper-tin alloy phase diagram in Figure 32. As previously shown, the brass in both fittings contained lead as a distinct, pure lead phase. Therefore, at the brass/solder interface, essentially pure tin is in intimate contact with pure lead.

The lead-tin alloy phase diagram shown in Figure 33 shows the consequences of this metallurgical coupling. As shown from this diagram, an alloy of lead and tin has a lower melting point than either of the pure metals. This diagram also shows that if a piece of pure tin is placed in intimate contact with a piece of pure lead and the temperature of this couple is increased, a layer of liquid metal will with a composition of 74% tin, 26% lead will form at 183 °C (361 °F). The same is true at the solder/brass interface on a microscopic level. Everywhere lead from the brass is in intimate contact with the tin phase in the solder, a film of liquid metal will form when the temperature is 361 °F or higher. Therefore, the region of solder in contact with the brass surface has an effective melting point that is 57 °F to 79 °F lower than the bulk solder alloy (418 °F - 440 °F).

This effect is shown schematically in Figure 34, and it can be used to answer the first three of the four questions presented above. First, because the solder only melts at the brass/solder interface, the joint can be separated without melting the most of the solder. Therefore, Joint Sections 1 and 2 can be separated without melting the solder ridge around the copper tube. Second, since the brass/solder interface melts at a lower temperature, the brass/copper joints will separate before the copper/copper joints. Third, since the solder only melts at the brass/solder interface, the majority of the solder is left on the copper tube.

Finally, in order to answer the fourth question, we must consider the pressure inside the water pipes during the fire. Because a drain was not installed in the sink, Mr. Kemp indicated that he would not have bled air from the water lines going to the sink. Thus, at the beginning of the fire the water lines under the sink would have been pressurized because the water was turned on but

filled with air rather than water. The ignition of portions of the wood of the kitchen sink cabinet nearby indicates that temperatures in the region of the disconnected water pipe were above 361 °F, which is sufficient to melt the solder at the brass interface as indicated above. The joints would have come apart from internal pressurization of the pipes or mechanical loads placed on the joints as components moved during the fire.



Figure 32.     Copper-Tin alloy phase diagram. The red line indicates the approximate composition of the "100% Watersafe" brand solder used by Mr. Kemp.

March 7, 2006

## Conclusions

The opinions and findings in this report were reached to a reasonable degree of scientific and engineering certainty based on information available to date. A summary of the findings and opinions reached in this report is listed below:

1. At the time the fire began, all joints of the water piping were intact.

2. The heat from the fire was sufficient to melt the solder at the copper/brass interface, but not the copper/copper soldered joints.

3. Pressure within water line provided the force necessary to separate joint between the copper tube and the brass valve when the solder melted.

4. The separation of the joint between the copper tube and the brass compression fitting followed. Either the weight of the brass valve/copper tube assembly or the movement of components during the fire could have provided sufficient force to separate this joint once the solder melted.

If additional information becomes available or additional analysis is performed, I reserve the right to revise these opinions.

Quinn C. Horn, Ph.D.
Senior Engineer

BN63809-A0T0-0306-R005

38