IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PACIFIC INDEMNITY COMPANY, | : | CIVIL ACTION NO. |
| | : | 04-11975(RWZ) |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| ALFRED KEMP, Individually and d/b/a | : | |
| KEMP PLUMBING | : | MEMORANDUM IN |
| | : | SUPPORT OF PLAINTIFF'S |
| and | : | MOTION IN LIMINE TO |
| | : | EXCLUDE CERTAIN |
| MARTIN SANDBORG, Individually and d/b/a | : | TESTIMONY FROM |
| SANDBORG PLUMBING AND HEATING, | : | DEFENDANT KEMP'S |
| | : | EXPERTS QUINN HORN |
| Defendants. | : | AND TIMOTHY MYERS |
| | : | |

## I.  INTRODUCTION

This is a property subrogation action involving a fire discovered early in the morning of December 20, 2002 at a carriage house owned by Roger and Michelle Marino, located at 256 Westfield Street, Dedham, Massachusetts. The case is scheduled for trial on Monday, June 5, 2006.

The carriage house was in the final stages of an extensive renovation project when the fire occurred. Plaintiff alleges that the fire was caused by the carelessness of defendant Alfred Kemp, a plumber, while using a torch to unsolder pipe joints under the kitchen sink of the carriage house on the afternoon of Thursday, December 19, 2002. Mr. Kemp denies using a torch in the carriage house on December 19. The question whether or not Mr. Kemp was using a torch on the afternoon preceding the fire is one of the most critical fact issues in the case.

Mr. Kemp has admitted that, while attempting to install a garbage disposal beneath the kitchen sink of the carriage house on the afternoon of December 19, he discovered that the required location for the garbage disposal – suspended from the sink's drain – physically

conflicted with certain water supply valves, piping and fittings Mr. Kemp had previously installed within the cabinet beneath the sink, such that it was necessary for Mr. Kemp to unsolder plumbing joints in order to dismantle and reconfigure the valves, piping and fittings to accommodate the garbage disposal (Kemp deposition, pertinent excerpts from which are attached as Exhibit "A," Pp. 74-80).

Photographs and physical inspections following the fire establish that one of the valve/ fitting assemblies Mr. Kemp admitted that he needed to remove with his torch in order to accommodate the garbage disposal was no longer in place on the piping, but was lying loose on the bottom of the kitchen cabinet, beneath the sink. Plaintiff has submitted expert reports from a fire investigator/fire protection engineer, a plumbing expert, and a metallurgist which, in sum, conclude that this loose valve/fitting assembly must have been unsoldered by a torch prior to the fire, and could not have come loose as a result of the assembly's exposure to an already-developed fire. Plaintiff intends to argue that these circumstances compel the conclusion that Mr. Kemp used his torch to unsolder pipe joints[1] while on the premises on the afternoon of December 19, 2002, and that Mr. Kemp's torch was therefore a viable ignition source for the fire.[2]

---

[1] Joints had to be melted loose and physically separated at both ends of the valve/fitting assembly in order for it to end up lying loose in the bottom of the cabinet beneath the sink after the fire.

[2] Plaintiff will offer further evidence from its own fire investigator, as well as from at least one investigator from the Massachusetts State Fire Marshal's Office that the plumber's torch was the only viable ignition source in the area in which the fire originated. "Where a fire investigator identifies the cause of the fire in terms of probabilities (as opposed to mere possibilities) by eliminating all but one reasonable potential cause, such testimony is highly probative." Breidor v. Sears Roebuck & Co., 722 F.2d 1134, 1138 (3d Cir. 1983). accord U.S. v. Diaz, 300 F.3d 66, 76 (1st Cir. 2002)(upholding admission of expert testimony as to the cause of a fire which was based upon evaluation of burn patterns at the fire scene and elimination of "alternate explanations for the cause of the fire").

The jury may, of course, draw such inferences as it chooses from the evidence, and may lend such weight to plaintiff's experts' opinions as it deems appropriate.  With one exception, all of the detail underlying the plaintiff's experts' analysis is not germane to this motion, which is instead principally based upon the fact that one aspect of the purported analysis performed by one of defendant Kemp's experts, Quinn Horn, is not even remotely within Horn's claimed area of expertise, and another of Kemp's experts, Timothy Myers, incorporates Horn's flawed analysis into Myers' analysis of the fire.

## II. PORTIONS OF QUINN HORN'S ANTICIPATED EXPERT TESTIMONY ARE BEYOND HIS EXPERTISE AND OTHERWISE WITHOUT FOUNDATION AND MUST THEREFORE BE EXCLUDED.

The aspect of both sides' experts' analyses which is relevant here involves a distinct ridge of solder on the vertical pipe (or "riser") to which the loose valve/fitting assembly had originally been soldered.  Both plaintiff's and Kemp's experts agree that this ridge of solder did not melt in the fire.  The ridge of solder is located adjacent to the site of the former solder joint between the riser and the loose valve, which joint indisputably was melted and separated some time between when Mr. Kemp began working in the kitchen on the afternoon of December 19, 2002 and when investigators from the Dedham Fire Department and the State Fire Marshal's Office began inspecting and photographing the fire scene on December 20, 2002.  Plaintiff's metallurgist, Thomas W. Eagar, issued a report which explained that only the intensely localized heat from a torch could have melted and separated the solder joint between the riser and valve without also melting the solder ridge which was located, at most, a few millimeters away (Dr. Eagar's report is attached as Exhibit "B").  Plaintiff's fire investigator/fire protection engineer concurs in this opinion, and more generally points out the numerous other solder joints in the immediate vicinity which did not melt apart in the fire.

Kemp's metallurgist, Quinn Horn, issued a report setting forth a theory as to how heat from an already developed fire which originated elsewhere could supposedly have melted the valve/riser joint while leaving the ridge of solder on the riser adjacent to the joint intact. (Pertinent excerpts from Horn's report are attached as Exhibit "C"). Plaintiff is prepared to discredit this theory from a factual, technical, and plausibility standpoint, and does not seek to exclude such testimony. However, Horn also digresses into areas which are plainly beyond his area of expertise, as reflected in the *Curriculum Vitae* Kemp submitted pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, summarizing Horn's qualifications (attached as Exhibit "D"). Specifically, the pertinent portion of Horn's report states:

> As mentioned in the introduction of this report, it is apparent that two conditions must be met to separate a soldered joint. First, the joint must be heated to a temperature sufficient to melt the solder. Second, a force must be applied to the joint to parallel to the pipe axis such that the opposing sections are pulled away from each other.
>
> In the case where a plumber used a torch to supply the heat, the torch would have been directed onto the fitting until the solder reached its melting point. The joints would then have been pulled apart and the plumber would <u>likely</u> remove the excess solder from the copper tube using a wet towel or rag while the solder was molten. It is important to remove the excess molten solder so that the joint can be soldered again in the future. The plumber will <u>typically</u> remove the excess solder from the separated joint while the solder is molten; otherwise, the joint must be heated again at some point in the future to remove the excess solder.
>
> Consider Joint Section 1, which is the copper tube with the ridge of solder. It is apparent that this ridge was not removed by a plumber after the joint was separated, which is not consistent with a plumber that is <u>preparing a joint for future use</u>. It is also apparent that this ridge of solder was not molten during the separation of the joint, and a plumber would <u>typically</u> supply sufficient heat to melt the excess solder to make it easy to remove. With respect to Joint Section 3, which is the copper tube that was joined to the brass

>   compression fitting, there was a considerable amount of excess solder found on the copper tube, indicating that the solder from the original joint was not removed after the joint was separated. Also, it would not have been practical to de-solder this joint since unthreading the compression fitting could have easily separated it.

(Exhibit "C," Pp 32-33)(emphasis added).

Contrary to the title of Horn's report, the discussion quoted above has nothing whatsoever to do with "Metallurgical Examination of Soldered Pipe Joints." Review of Exhibit "D" establishes that Horn does not have any "knowledge, skill, experience, training, or education" beyond that of a layman, which would qualify him to give opinions as to what "a" plumber would "likely" do, or as to what plumbers "typically" do, and Horn's proposed testimony in that regard would not in any way be probative or "assist" the jury, within the meaning of Rule 702 of the Federal Rules of Evidence.[3] "Unless the witness's opinions are informed by expertise, they are no more helpful than those of a lay witness." U. S. v. Shay, 57 F.3d 126, 133 (1st Cir. 1995). Moreover, Mr. Horn's unqualified and unsupported speculation as to what plumbers "typically" or are "likely" to do is, in turn, the sole basis for Horn's broader conclusion that "at the time the fire began, all joints of the water piping were intact" (Exhibit "C," Pg. 38). It is one thing for Horn to put forth an explanation as to how the valve/fitting assembly supposedly could have melted off during the fire, rather than prior to the fire.

---

[3] Plaintiff's metallurgical expert's rebuttal report (Exhibit "E") states "the discussion of how a plumber unsolders a joint on p. 32 of the Horn report is purely speculative. I have performed plumbing repairs and this is not the practice that I would use, nor is it the practice that I have seen used by licensed plumbers." This is included purely as a precautionary measure, in the event Horn is permitted to give his opinion as to what plumbers "typically" do, or are "likely" to do. Unlike the Horn report, Dr. Eagar at least provides some experiential foundation for his observations about what plumbers commonly do. However, plaintiff would have no intention of offering this testimony if Horn's testimony is excluded. More importantly, plaintiff has submitted a rebuttal report from an indisputable expert in plumbing practices who flatly refutes Horn's testimony about what plumbers "typically" or are "likely" to do, generally, and specifically in these circumstances, where the plumbing components in question could not be re-used as configured (Exhibit "F").

However, Horn's report is devoid of any reasoning or analysis, based upon his "scientific, technical, or other specialized knowledge," apart from his unqualified statements as to what he speculates a plumber would do in this circumstance,[4] as to how the physical evidence he

---

[4] During a May 1, 2006 Local Rule 7.1(A)(2) pre-motion conference, one of Kemp's lawyers stated that this issue was "mooted" by the fact that Horn supposedly intends to testify that his opinion is based upon what Mr. Kemp himself supposedly says (or will say) he would do in this hypothetical (according to Kemp, at least) situation. This argument is flawed for at least three distinct reasons:

  (1) First, this purported "basis" for Horn's opinion is not disclosed, or even hinted at, anywhere in Horn's report, as required by Fed. R. Civ. P. 26(a)(2)(B). This is presumably because this purported "basis" for Horn's opinion was first conceived following the parties' first pre-motion conference on this issue on April 27, 2006. In any case, pursuant to Fed. R. Civ. P. 37(c)(1), the failure to include this purported basis for the opinion in Horn's Rule 26(a)(2)(B) report precludes reliance upon it;

  (2) Second, Kemp failed to make any expert disclosure whatsoever with respect to Kemp himself, as would have been required under Rule 26(a)(2). Given Kemp's insistence that he did not unsolder any valves, joints or fittings, any testimony by Kemp as to what he, as a plumber, "typically" does, or would "likely" have done in such hypothetical (according to Kemp) circumstances is clearly FRE 702 opinion testimony, and therefore should be excluded because of the unjustified failure to make the disclosures required under Fed. R. Civ. P. 26(a)(2). Prentiss & Carlisle Company v. Koehring-Waterous, 972 F.2d 6, 8-9 (1st Cir. 1992)(defendant's employee's proposed testimony properly excluded when employee was not disclosed as an expert, and relevance of testimony would depend on a showing of witness' competence and qualifications in a technical area). Kemp cannot bootstrap this information into evidence by having another expert purport to rely upon it as a (heretofore undisclosed) "basis" for one of that expert's otherwise inadmissible opinions; and

  (3) Finally, the opinion of one plumber, who happens to be a defendant and Mr. Horn's client in this matter, as to what he "would have" done in this circumstance can hardly be deemed a reasonable basis under FRE 703 for Horn's otherwise unsubstantiated assertion as to what plumbers "typically" do, or are "likely" to do. Redman v. John D. Brush & Co., 111 F.3d 1174, 1179 (4th Cir. 1997)(metallurgist could not offer opinion whether safe was "burglar deterrent" when expert's sole source of information regarding industry standards was hearsay conversations with personnel in store that sold safes); Ricciardi v. Children's Hospital Medical Center, 811 F.3d 18, 24-25 (1st Cir. 1987)(upholding district

examined is in any way <u>inconsistent</u> with the valve/riser joint having been unsoldered prior to the fire, much less any reason as to why it is <u>more</u> likely that the valve supposedly melted off <u>during</u> the fire, rather than having been melted upon <u>prior</u> to the fire.

### III. CERTAIN PURPORTED OPINIONS OF KEMP'S EXPERT TIMOTHY MYERS ARE NOT THE PROPER SUBJECT OF EXPERT TESTIMONY.

Horn's unqualified, unsupported, and therefore inadmissible conclusion that the riser/valve joint most likely melted apart during the fire, rather than prior to the fire, in turn, is adopted uncritically in the report of Kemp's alleged fire expert, Timothy Myers, which states, in pertinent part:

> **4.4  Metallurgical Examination of Piping Joints**
>
> The report by Mr. Klem cites the disconnected pipe joints found after the fire as proof that Mr. Kemp had been soldering the afternoon prior to the fire. It is also reasoned in this report that the fire alone would not have been able to melt the solder in two of the joints without affecting the others. Dr. Quinn Horn performed a metallurgical examination of the two piping joints that became disconnected. He describes in his report that the solder remaining on the joints is not consistent with the joints being heated by a torch and removed by a plumber. Most of the solder on the joints does not appear to have melted after the joints were originally joined.

(Myers' report, pertinent excerpts from which are attached as Exhibit "G," Pg. 38)

Kemp cannot bootstrap the unfounded, unqualified, and inadmissible conclusions in the Horn report into evidence simply by having another fire expert adopt those conclusions. Further,

---

> court's ruling precluding expert from relying upon data that was not "of a type reasonably relied upon" by experts in the field); <u>U.S. v. Tran Trong Cuong</u>, 18 F.3d 1132, 1143 (4th Cir. 1994)("Reports specifically prepared for litigation are not, by definition 'of a type reasonably relied upon by experts in the particular field'"); <u>accord</u> <u>Lynch v. Merrell-National Laboratories</u>, 646 F. Supp. 856, 865 (D. Mass. 1986) <u>affirmed</u> 830 F.2d 1190 (1st Cir. 1987).

Horn's improper opinion is the principal basis for a series of non-expert, and therefore inadmissible, conclusions set forth at the conclusion of Myers' report. Specifically, the following conclusions are set forth at Page 40 of Myers' report:

> 2. The plumber, Mr. Kemp, did not perform soldering in the kitchen on the afternoon before the fire.
>
> 3. At the time the fire began, all joints of the water piping were intact, water was turned on in the carriage house, and the water piping under the sink was pressurized.

Apart from Horn's inadmissible conclusion that the valve/riser joint came apart during the fire, rather than prior to the fire which, in turn, depends exclusively upon Horn's speculation as to what plumbers "typically" do or are "likely" to do, the sole evidentiary or analytical support cited by Myers in support of his conclusions that Mr. Kemp did not solder in the kitchen on December 19, that all joints of the water piping were intact before the fire, the water was turned on in the carriage house, and that the water piping under the sink was pressurized, is Myers' uncritical adoption (and worse, endorsement of the credibility of) certain deposition testimony. These matters are not the proper subject for expert opinion in this case.

For example, focusing first upon Myers' conclusion that "at the time the fire began …water was turned on in the carriage house" there is nothing in Myers' *Curriculum Vitae* (Exhibit "H") which would suggest that he holds any particular expertise on the subject of whether water is or is not turned on in a structure at any particular point in time, and his "analysis" of that fact issue, such as it is, clearly does not draw upon any "scientific, technical, or other specialized knowledge" that he does possess. Whether or not the water was turned on to the carriage house at the time of the fire is a significant, subsidiary issue in the case.[5] If the

---

5    The fire was discovered after 2:00 A.M.. on December 20, after the building had been vacant for over 9 hours. Therefore, there is no direct evidence as to whether the water was "on," (or, for that matter, as to whether it was "off") at the time of the fire. Defendant would have the jury infer that the water was "on," based upon testimony that it was "on" earlier in the day on December 19, and the absence of any testimony that it was turned "off."

water was "on" when Mr. Kemp left the premises late in the afternoon on December 19, then the valve/fitting assembly which was subsequently observed separated from the riser would have had to have been in place. Otherwise, a geyser spewing from the open riser would have been readily detected.

Predictably, Kemp says that he did not shut off the water. But, just as Kemp could plausibly have lied about using his torch on the afternoon of December 19 in order to attempt to avoid becoming implicated in a $2 Million fire, Kemp could, with equal plausibility, have lied about turning the water off in order to use his torch. While there is one witness who says that he flowed water in the carriage house during the afternoon of the fire, Mr. Kemp could have easily shut the water down after that witness left the scene.[6]

Plaintiff alleges that the same physical evidence which establishes that the valve/fitting assembly had been removed prior to the fire necessarily establishes that the water was also turned off at the time of the fire. The jury will evaluate all of the circumstantial and physical evidence and weigh the credibility of the witnesses and decide whether Mr. Kemp did or did not turn the water "off." Myers does not propose to bring any "scientific, technical or other specialized knowledge" to bear on that issue, and whatever opinions he might offer in that regard cannot properly "assist" the jury within the meaning of Rule 702 of the Federal Rules of Evidence. Myers does not apply any technical analysis to the testimony of the fact witnesses with respect to that issue but, instead, simply uncritically rehashes (and, worse, endorses the credibility of) testimony that is favorable to his client (Exhibit "G,: Pp. 36-38).[7] This is not the

---

[6] Co-defendant Martin Sandborg claims that he observed the main shutoff valve in the structure in the "on" position when he first observed it eleven days after the fire. Putting aside the question as to the probative value of such testimony on the issue as to the position of the valve prior to and during the fire, Sandborg, whose potential liability stems from the fact that he was the prime plumbing contractor for the renovation project, has the same potential motivation as Kemp to prevent Kemp from becoming implicated in the cause of the fire.

[7] "[A]n expert's opinion that another witness is lying or telling the truth is ordinarily inadmissible pursuant to Rule 702 because the opinion exceeds the scope of the

proper role of an expert or of expert testimony.[8]  Plaintiff does not suggest, however, that Myers cannot refer to and rely upon testimony that water was on earlier in the day, and the absence of direct testimony that the water was turned off, in support of his opinion that Kemp did not start the fire (assuming that Myers' testimony establishes that he is otherwise qualified to render an opinion as to the cause of this fire[9]), but Myers cannot, in conformance with Rule 702, express an opinion that the water was on.

---

expert's specialized knowledge and therefore merely informs the jury that it should reach a particular conclusion." U. S. v. Shay, 57 F.3d 126, 131 (1st Cir. 1995)  "In general, expert testimony which does nothing but vouch for the credibility of another witness encroaches upon the jury's vital and exclusive function to make credibility determinations, and therefore does not 'assist the trier of fact' as required by Rule 702." U. S. v. Charley, 189 F.3d 1251, 1267 (10th Cir. 1999); "[E]xpert witnesses may not testify based on their personal view of the veracity of a lay witness' testimony." Di Bella v. Hopkins, 403 F.3d 102, 121 (2d Cir. 2005); "[E]vidence that merely tells the jury what result to reach is not sufficiently helpful to the trier of fact to be admissible." Kostelecky v. NL Acme Tool/NL Industries, Inc., 837 F.2d 828, 830 (8th Cir. 1980); see also Advisory Committee Note to Fed. R. Evid. 704 (Rules 701, 702 and 403 "afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day."); Viterbo v. Dow Chemical Co., 826 F.2d 420, 424 (5th Cir. 1987)(expert's testimony excluded when it was "no more than [plaintiff's] testimony dressed up and sanctified as the opinion of an expert").  None of the rare exceptions to this principle apply here.

[8]  Myers does raise the possibility that water squirting from the riser could explain what he perceives to be reduced fire damage beneath the sink, as compared to other areas in the kitchen (Exhibit "G," Pp. 38-39).  This scenario is not, however, put forth with any degree of certainty that would be sufficient to qualify as, or form the basis for, an admissible expert opinion.  In fact, Myers is inconclusive as to whether the water was even "on" or "off" when the valve came off the riser.  Moreover, the possibility put forth by Myers is at odds with his basic theory, which is that the supposedly reduced level of fire damage beneath the sink is attributable to the fire originating elsewhere, due to some other, undetermined cause.

[9]  Plaintiff reserves the right to object at trial to Myers' qualifications to render any opinion as to the origin or cause of this fire.

The same problems afflict Myer's proposed opinion that Mr. Kemp "did not perform soldering in the kitchen on the afternoon before the fire." Again, nowhere does Myers offer any independent "scientific, technical, or other specialized" analysis in support of this opinion. Myers merely adopts the flawed analysis of Quinn Horn, discussed previously, and, again, uncritically adopts Mr. Kemp's denial that he was soldering.[10] Myers does not and cannot bring any aspect of his "knowledge, skill, experience, training or education," above and beyond that possessed by a layman, to the question of whether or not Mr. Kemp was soldering. Again, while Myers may rely upon Mr. Kemp's denial that he was soldering in support of Myers' opinion that Kemp did not cause the fire (assuming that Myers' testimony establishes that he is otherwise qualified to render such an opinion), Myers cannot properly offer an independent opinion that Kemp was not soldering.

The preceding discussion applies as well to Myers' professed opinions that "at the time the fire began, all joints of the water piping were intact …and the water piping under the sink was pressurized." These opinions are, again, derived solely from Mr. Horn's inadmissible opinion and a non-expert re-hash of testimony by a fact witness which does not draw upon any specialized knowledge or expertise possessed by Myers.

        Respectfully submitted,

        COZEN O'CONNOR

        BY:   /s/Daniel Q. Harrington
             DANIEL Q. HARRINGTON
             1900 Market Street
             Philadelphia, PA  19103
             215-665-2126

---

[10]  While there are witnesses who say they did not see Kemp soldering on December 19, these witnesses cannot rule out Kemp soldering when they were not present.

                                          MATTHEW H. FEINBERG
                                        FEINBERG & KAMHOLTZ
                                        125 Summer Street, 6th Floor
                                        Boston, MA  02110
                                        617-526-0700

                                        Attorneys for Plaintiff

1\2469088\1 132682.000