IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PACIFIC INDEMNITY COMPANY, | : CIVIL ACTION NO. |
| | : 04-11975(RWZ) |
| Plaintiff, | : |
| v. | : |
| | : |
| ALFRED KEMP, Individually and d/b/a | : **AFFIDAVIT OF** |
| KEMP PLUMBING | : **DANIEL Q. HARRINGTON IN** |
| | : **OPPOSITION TO DEFENDANT** |
| and | : **KEMP'S MOTION IN LIMINE** |
| | : **TO PRECLUDE EVIDENCE OF** |
| MARTIN SANDBORG, Individually and d/b/a | : **ALLEGED PRIOR/UNRELATED** |
| SANDBORG PLUMBING AND HEATING, | : **CONDUCT** |
| | : |
| Defendants. | : |

Daniel Q. Harrington, being first duly sworn, states as follows:

1. I am an attorney duly admitted to practice law in Pennsylvania, New Jersey, New York and Minnesota and in numerous federal courts, and have been admitted to appear *pro hac vice* for the plaintiff in this matter.

2. Attached as Exhibit "A" are excerpts from the deposition of Kraig Magnussen in this matter.

3. Attached as Exhibit "B" are excerpts from the Deposition of defendant Martin Sandborg in this matter.

4. This Affidavit is being submitted in Opposition to Defendant Kemp's "Motion In Limine To Preclude Evidence Of Alleged Prior/Unrelated Conduct."

DANIEL Q. HARRINGTON

SWORN TO AND SUBSCRIBED
BEFORE ME THIS 19TH DAY
OF March, 2007.

\3032377\1 132682.000

NOTARIAL SEAL
JOANNE S DILLON
Notary Public
CITY OF PHILADELPHIA
PHILADELPHIA COUNTY
My Commission Expires Aug 28, 2007

Page 1

```
     VOLUME I
     PAGES: 1 - 186
     EXHIBITS: 1 - 4
IN THE UNITED STATES DISTRICT COURT
  FOR THE DISTRICT OF MASSACHUSETTS

     C.A. NO. 04 11975RWZ

*****************************
PACIFIC INDEMNITY COMPANY,      *
     Plaintiff,                 *
                                *
     vs.                        *
                                *
ALFRED KEMP, Individually and   *
d/b/a KEMP PLUMBING,            *
     and                        *
MARTIN SANDBORG, Individually and *
d/b/a SANDBORG PLUMBING AND HEATING, *
     Defendants.                *
*****************************

     DEPOSITION OF KRAIG MAGNUSSEN, a witness
called on behalf of the Defendant, taken pursuant
to the applicable provisions of the Federal Rules
of Civil Procedure, before Jacqueline Curran,
Registered Merit Reporter and Notary Public in and
for the Commonwealth of Massachusetts, at the law
offices of Ryan, Coughlin & Betke, LLP, 175
Federal Street, Boston, Massachusetts, on Friday,
September 23, 2005, commencing at 10:10 a.m.

     CURRAN COURT REPORTING
          21 Rowe Hill Road
     Stoneham, Massachusetts 02180
          (781) 279-8400
```

Page 2

```
     APPEARANCES
REPRESENTING THE DEFENDANT, ALFRED KEMP,
Individually and d/b/a KEMP PLUMBING:
  RYAN, COUGHLIN & BETKE, LLP
     By: John J. Ryan, Jr., Esq.
     175 Federal Street
     Boston, MA 02110
     (617) 988-8050

REPRESENTING THE DEFENDANT, MARTIN SANDBORG,
Individually and d/b/a SANDBORG PLUMBING:
  FINNEGAN, UNDERWOOD, RYAN & TIERNEY
     By: Stimpson B. Hubbard, Esq.
     22 Batterymarch Street, 4th Floor
     Boston, MA 02109
     (617) 348-9200

REPRESENTING THE PLAINTIFF:
  COZEN O'CONNOR
     By: Daniel Q. Harrington, Esq.
     1900 Market Street, 3rd Floor
     Philadelphia, PA 19103-3508
     (215) 665-2126
```

Page 3

```
          I N D E X
WITNESS: Kraig Magnussen
Examination By:  DIRECT  CROSS  REDIRECT  RECROSS
  Mr. Ryan          6              179
  Mr. Harrington           152             180
  Mr. Hubbard              167

          E X H I B I T S
No.     Description                    Page
No. 1, package of notes                 64
No. 2, Massachusetts Fire Incident Report   129
No. 3, Fire Investigation Summary Report    131
No. 4, packet of notes                 144




(All original exhibits retained by Attorney Ryan)
```

Page 4

```
     KRAIG MAGNUSSEN, having been satisfactorily
identified by the production of his driver's
license, and duly sworn by the Notary Public, was
examined and testified as follows:
     MR. RYAN:  Stipulations.  Do you
want to reserve all objections until the
time of trial and reserve motions to strike
until the time of trial?
     MR. HUBBARD:  That's fine.
     MR. HARRINGTON:  That's fine.
     MR. RYAN:  Mr. Magnussen, my
name is John Ryan.  I represent Al Kemp in
this case.  You have the right -- the
deposition when it's done will be
transcribed by the stenographer, it will
come out in a book form and question,
answer, question, answer, and you have the
right to read it and review it to make sure
that the stenographer took it down
accurately or to correct any errors she may
have taken down in your testimony, and
that's entirely your right.  Would you like
to do that or --
     THE WITNESS:  Yeah, I'd like to
```

Page 97

1  off.
2     Q. So putting your description here in
3  layman's terms, again, on December 18, 2002,
4  sweating stops means soldering on shut-off valves?
5     A. Yes.
6     Q. And that work was being done in the
7  basement, the first floor, and the second floor,
8  is that correct?
9     A. Yes.
10    Q. And would that have included the
11 bathrooms and the kitchen?
12    A. It would include wherever we had a water
13 supply, it would include bathrooms, second floor,
14 it would include -- it would include the first
15 floor bathroom, kitchen sink in both the cabana
16 areas in the basement, it was a men's and women's
17 cabana, wash rooms.
18    Q. Do you remember seeing Al Kemp or anyone
19 assisting him doing the soldering of shut-off
20 valves in the kitchen on December 18, 2002 which
21 would have been two days before the fire?
22    A. Not personally, I don't remember him
23 doing it.
24    Q. Whether you remember seeing it or not,

Page 98

1  would you likely have been through there to
2  observe it at some point as you were walking
3  through the site?
4     A. Not necessarily. I don't recall seeing
5  him sweat the joints that day, but obviously, he
6  put all those joints on that day because he had
7  the water off to sweat all the joints.
8     Q. And that's because when you have an open
9  pipe and you're putting a shut-off valve on it,
10 you, obviously, have to shut the water off in
11 order to make sure water isn't coming out while
12 you're trying to put this valve on?
13    A. Right. When you go to cut your cap, you
14 got to make sure -- then they drain the line into
15 a bucket or something, they got to get that pipe
16 dry before they solder the stops on.
17    Q. And where do you drain the line from?
18    A. From the location where you cut the stop
19 -- where you cut the cap. If you have a hot and
20 cold coming out behind the cabinet, you have to
21 drain those two lines before you solder it or your
22 solder isn't going to work and the water is going
23 to come out anyhow when you cut the cap to put the
24 stop on.

Page 99

1     Q. Had you ever observed Al Kemp soldering
2  anywhere either in the main house or in the
3  carriage house during the course of your
4  supervising this Marino project?
5     A. Oh, I'm sure I have, yes.
6     Q. At any time did you make any observation
7  that led you to believe that he was not soldering
8  properly?
9     A. No. I believe he solders properly.
10    Q. Did you ever in any of your observations
11 of his soldering work see him burn the cabinet
12 where he was soldering?
13    A. No.
14    Q. In any observations you made of the
15 Marino property, either in the main house or in
16 the carriage house, did you ever see evidence that
17 Al Kemp had burned the cabinet where he was
18 soldering?
19    A. No.
20    Q. Going now next to where it makes
21 reference to -- and again, these are the notes of
22 December 18, 2002 -- to toilet flanges. Could you
23 tell us what that's a reference to?
24    A. Toilet flanges. It's a round five inch

Page 100

1  steel flange you bolt to the floor over your
2  wasteline for the toilet, and in a sense they have
3  bolt receivers that you bolt the toilet to so you
4  have a flange you're bolting to the floor then in
5  return, you have two bolts that come up to the
6  bottom of the toilet to bolt the toilet to the
7  flange.
8     Q. Can you tell what toilets that's making
9  reference to on December 18, 2002?
10    A. No.
11    Q. And then the reference to setting the
12 toilets I take it means putting the toilet on top
13 of the toilet flange?
14    A. Yes. You put a -- normally it's a wax
15 gasket you set on the flange for water -- for
16 water tightness, you set your toilet hub down into
17 that, the toilet -- the toilet flange, and then
18 you bolt it and the wax gasket expands. Some
19 people call it bee's wax.
20    Q. I notice you used the plural with
21 respect to flanges and toilets which would suggest
22 it was more than one? Do you have --
23    A. Yes. I would say it probably was more
24 than one. I don't know if it was all or not

Deposition of Martin E. Sandborg
November 14, 2005

---

**Page 1**

```
         VOLUME I
         PAGES: 1 - 77
         EXHIBITS: 1
   IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF MASSACHUSETTS

         C.A. NO. 04 11975RWZ

*****************************************
PACIFIC INDEMNITY COMPANY,        *
         Plaintiff,               *
                                  *
         vs.                      *
                                  *
ALFRED KEMP, Individually and     *
d/b/a KEMP PLUMBING,              *
         and                      *
MARTIN SANDBORG, Individually and *
d/b/a SANDBORG PLUMBING AND HEATING, *
         Defendants.              *
*****************************************

     DEPOSITION OF MARTIN E. SANDBORG, a witness
called on behalf of the Plaintiff, taken pursuant
to the applicable provisions of the Federal Rules
of Civil Procedure, before Jacqueline Curran,
Registered Merit Reporter and Notary Public in and
for the Commonwealth of Massachusetts, at the law
office of Ryan, Coughlin & Betke, LLP, 175 Federal
Street, Boston, Massachusetts, on Monday, November
14, 2005, commencing at 1:55 p.m.
         CURRAN COURT REPORTING
           21 Rowe Hill Road
         Stoneham, Massachusetts 02180
             (781) 279-8400
```

**Page 2**

```
         APPEARANCES
REPRESENTING THE DEFENDANT, ALFRED KEMP,
Individually and d/b/a KEMP PLUMBING:
   RYAN, COUGHLIN & BETKE, LLP
   By: John J. Ryan, Jr., Esq.
   175 Federal Street
   Boston, MA 02110
   (617) 988-8050

REPRESENTING THE DEFENDANT, MARTIN SANDBORG,
Individually and d/b/a SANDBORG PLUMBING:
   FINNEGAN, UNDERWOOD, RYAN & TIERNEY
   By: Stimpson B. Hubbard, Esq.
   22 Batterymarch Street, 4th Floor
   Boston, MA 02109
   (617) 348-9200

REPRESENTING THE PLAINTIFF:
   COZEN O'CONNOR
   By: Daniel Q. Harrington, Esq.
   1900 Market Street, 3rd Floor
   Philadelphia, PA 19103-3508
   (215) 665-2126
```

**Page 3**

```
                 I N D E X
WITNESS: Martin E. Sandborg
Examination By:  DIRECT  CROSS  REDIRECT  RECROSS
Mr. Harrington    4              60/73
Mr. Ryan                   53           69


                 E X H I B I T S

No.       Description               Page

No. 1, Defendant Martin Sandborg and d/b/a    45
Sandborg Plumbing & Heating's Answers to
Plaintiff's First Set of Interrogatories




(Original exhibit retained by Attorney Harrington)
```

**Page 4**

```
 1        MARTIN E. SANDBORG, having been
 2   satisfactorily identified by the production of his
 3   driver's license, and duly sworn by the Notary
 4   Public, was examined and testified as follows:
 5                 ****************
 6          DIRECT EXAMINATION
 7   By Mr. Harrington:
 8       Q.  State your name for the record.
 9       A.  Martin E. Sandborg.
10       Q.  Mr. Sandborg, I introduced myself to you
11   out in the lobby a little while ago when I came
12   in.  My name is Dan Harrington, I represent
13   Pacific Indemnity Company which is the insurance
14   company which insured the Marino carriage house
15   which was damaged in a fire which was discovered
16   on Friday, December 20, 2002.  As you are aware,
17   you are one of two defendants in that lawsuit and
18   we are here for your deposition today.  A couple
19   of things I'm sure Mr. Hubbard has explained to
20   you in the deposition process.  The court reporter
21   is taking down word for word everything that's
22   said in the room here, my questions and any other
23   questions you're asked and your answers to those
24   questions.  She can only record one of us at a
```

PLAINTIFF'S EXHIBIT 8

Deposition of Martin E. Sandborg
November 14, 2005

Page 29

1    Q. Kemp Exhibit 3 are some pages from a log
2  Kraig Magnussen -- you know who he was of course?
3    A. Yes.
4    Q. Prepared relating to the job at the
5  Marino property. I'm showing you on the December
6  17, '02 entry down at the bottom it says, Sandborg
7  Plumbing, Marty came by, did not speak to me in
8  relation to his schedule, and I know there's no
9  reason you would have seen this, you know, you may
10 have seen it since then, does this give you any
11 recollection of being at the property on the 17th?
12   A. No.
13   Q. Do you recall there being any scheduling
14 issues between you and Mr. Magnussen with respect
15 to this job?
16   A. I don't follow you.
17   Q. Well, any questions or issues that came
18 up about him wanting to know when you were going
19 to do something on the job site, anything like
20 that?
21   A. Nothing other than the normal
22 conversations back and forth.
23   Q. Do you recall there being any concern or
24 conversations expressed before the fire about the

Page 30

1  timing of getting plumbing work done at the
2  carriage house?
3    A. Yes.
4    Q. What do you recall?
5    A. I recall Thursday afternoon late in the
6  day standing in the kitchen leaning in front of
7  the dishwasher against the countertop talking with
8  Kraig, Al, discussing whether or not the
9  dishwasher could be installed by the end of the
10 day and the discussion was no. Kraig was quite
11 perturbed with us that it wasn't going to happen
12 that day. All we were going to do is just sort of
13 slide it in because Monday or Tuesday, the gas
14 stove was going to be delivered so trying to be
15 somewhat efficient, I had hoped we could get all
16 of those done at the same time.
17   Q. Why couldn't the dishwasher be finished
18 that day?
19   A. Because Kraig wanted everyone out of the
20 house by 4:00 every day.
21   Q. Besides the gas stove and the
22 dishwasher, do you know of anything else that
23 remained to be done?
24   A. The disposal had to be installed.

Page 31

1    Q. Was that discussed with Kraig during
2  this conversation?
3    A. Yes.
4    Q. What was that discussion?
5    A. We could not install the disposal until
6  a water valve was turned under the sink.
7    Q. Why was that?
8    A. Because the disposal would hit it.
9    Q. Was that all that was going to need to
10 be done is to rotate the valve?
11   A. Yes.
12   Q. There was no other piping that would
13 obstruct the disposal?
14   A. Not that I'm aware of.
15   Q. Had you eyeballed this situation
16 yourself?
17   A. Yes.
18   Q. Okay. How did you find out that a valve
19 had to be -- needed to be turned?
20   A. Al told me.
21   Q. And then you think you looked under
22 there to see?
23   A. I know I did.
24   Q. And from what you saw, it looked like

Page 32

1  all you'd have to do is rotate a valve?
2    A. Correct.
3    Q. When did you come to the carriage house
4  that day?
5    A. I think it was late in the day, 3:30ish.
6  It was at the -- I know it was at the very end of
7  the day because we were all -- Kraig was going to
8  have a little Christmas get-together on Friday and
9  we were talking and you have to understand when we
10 go -- a lot of times when we go to these jobs,
11 sometimes there's a little bit of conversation
12 that doesn't pertain to the work.
13   Q. Sure.
14   A. You know, fishing or a vacation or what
15 you're going to do for the holiday. I was
16 friendly with a lot of the other people on that
17 job, that fellow that sort of runs the estate, Bob
18 Cullinane, Kraig, he and I had become friendly
19 over the last four or five years working together
20 so I'm thinking -- and I also checked on the
21 toilets that we were swapping out, I think Al
22 swapped out a toilet in the main house as well.
23   Q. Was Shields still there when you came?
24   A. He had just left.

8 (Pages 29 to 32)

Deposition of Martin E. Sandborg
November 14, 2005

Page 53

CROSS-EXAMINATION
By Mr. Ryan:
  Q.  Mr. Sandborg, my name is John Ryan.  I represent Al Kemp.  I have just a couple of questions.  You said that you, Al, and Kraig Magnussen discussed the disposal issue in the kitchen, that would have been Thursday, December 19, 2002?
  A.  I believe so.
  Q.  I think you said earlier something about leaning up against the counter or sitting on the counter and talking about it in the kitchen?
  A.  It was a candid conversation and I went in there to, like I said, to discuss several issues, the completion of the kitchen, when the stove was going to be delivered, Christmas party, and I do remember leaning on the counter because it was a tile counter and I was concerned with my equipment that I had on my belt that I might have chipped it.  That's why I know I leaned against it but.
  Q.  For the time you were there did you see Al Kemp doing any soldering --
  A.  No.

Page 54

  Q.  -- that day?
  A.  No.
  Q.  There's been a suggestion in the case that Mr. Kemp when he did some soldering under the kitchen sink burned the wood in various places as he was doing soldering, that is, the finished cabinet.  Have you ever seen Al Kemp perform soldering in an under-the-sink cabinet where he burned the wood in the finished cabinet?
  A.  No.  No.
  Q.  Would you have hired Mr. Kemp back again if you had found that he was doing soldering and burning the wood in the under-the-sink cabinet?
  A.  No.
  Q.  When you were talking about having to adjust the valve in order to accommodate the disposal under the sink, was that going to be done the next day, Friday, December 20th?
  A.  Yes.
  Q.  Do you know the reason that it wasn't -- that work wasn't being done on Thursday, December 19th?
  A.  I believe 'cause the tile guy was still working downstairs doing tile and grouting and he

Page 55

needed water and any time we shut off the water on any project like that, the painters, if there are painters, masons, tile guys, so they don't use the facilities, we just, you know, will inform everybody when we're going to shut the water off so they have time.
  Q.  Could you explain -- strike that.
      In order for Al Kemp to have rotated this valve, he would have had to have shut off the water, is that your --
  A.  Yes.
  Q.  -- testimony?  Could you explain for us why he would have had to have shut off the water?  I understand the question -- the answer may be obvious to you, but if you could just explain for us why he would have had to have shut off the water to do that.
  A.  Well, because, number one, to try to heat up solder when it's under pressure, water or air, you can't do it with water, and if you do it with air, it will blow off and run all over the place.
  Q.  The soldering work that was going to have to be done to adjust this valve would have

Page 56

been soldering work that would have been beneath the valve, that is, between the water source and the valve, is that correct?
  A.  Correct.
  Q.  And what would have happened if Mr. Kemp had started to unsolder that joint without shutting off the water?
  A.  One of two things, if the -- if the water was up in the pipe at the valve, he wouldn't have been able to heat it up.
  Q.  He wouldn't have been able to heat the pipe up?
  A.  No.  If the water was right up to it, and if the pipe was full of air, which it sometimes is until we can install the drain and disposer, we install the drain and disposer and then run the water, if it was full of air when you heat it up, it will blow off.
  Q.  And why is that?
  A.  Because there's 50 pounds of pressure behind there.  You can heat up a joint with air in it and the solder -- the air will blow the solder right out and in turn blow the joint right off.
  Q.  I just want to make sure I have your

14 (Pages 53 to 56)